**George KIRSTEIN and Joy Kirstein, Plaintiffs,**

**v.**

**W.M. BARR & COMPANY, INC. and Parks Corporation, Defendants.**

No. 97 C 0002.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 28, 1997.

Paul R. Schuldiner, Chicago, IL, for Plaintiff.

Jeffrey Adam Brauer, Williams & Montgomery, Chicago, IL, for Defendant W.M. Barr & Co., Inc.

Jeffrey Adam Brauer, Williams & Montgomery, Chicago, IL, Daniel John Donnelly, Michael James Mullen, Kralovec & Marquad, Chartered, Chicago, IL, for Defendant Park Corp.

### MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

George Kirstein ("Kirstein") and his wife Joy Kirstein ("Joy") (collectively "plaintiffs") sue W.M. Barr & Company, Inc. ("Barr") and Parks Corporation ("Parks") (collectively "defendants"). Counts I and II are products liability claims brought by Kirstein. Count III is a claim for loss of consortium brought by Joy. In Count IV, Joy claims she is entitled to reimbursement for Kirstein's medical expenses under the Family Expense Act. The defendants have filed separate motions for summary judgment pursuant to Fed. R.Civ.P. 56.

### BACKGROUND

Plaintiffs are residents of Westmont, Illinois. Barr is a Tennessee corporation with its principal place of business in Tennessee; Parks is a Massachusetts corporation with its principal place of business in Massachusetts. As complete diversity exists and the amount in controversy exceeds $75,000, this court has jurisdiction pursuant to 28 U.S.C. § 1332.

When Kirstein purchased his house, the kitchen, foyer, hallway and bath areas had linoleum flooring. Kirstein decided to replace the linoleum flooring with parquet wood flooring. Kirstein pulled the linoleum off the floor. Defendants' 12(M) Statement of Undisputed Material Facts ("Defs.12(M)") ¶ 18. Kirstein knew that before laying down the parquet floor tiles, he needed to remove the mastic glue material that remained on the floor; he realized he needed an adhesive remover for this task. *Id.* On August 16, 1994, Kirstein purchased two gallons of Parks Adhesive Remover, a product manufactured by defendant Parks. *Id.* ¶ 19. Kirstein read the instructions on the label of the adhesive remover. *Id.* ¶ 20. The next morning, Kirstein coated the kitchen area with adhesive remover and scooped up what was left behind with a shovel. Kirstein then did the same in the foyer, hallway, and bathroom. *Id.* ¶ 21. After using the shovel, Kirstein found there was still a residual gelatinous substance on the floor. *Id.* ¶ 22. He remembered that the adhesive remover instructions stated, "For best results, wash stripped surface with Parks Lacquer Thinner before applying new adhesive." *Id.*

Kirstein went to a store to purchase lacquer thinner. He bought one gallon of Klean–Strip Lacquer Thinner, a product manufactured by defendant Barr. *Id.* ¶ 23. Prior to using the lacquer thinner, Kirstein read the instructions, warnings, and labels on the lacquer thinner can. *Id.* The warning label on the lacquer thinner's main display panel states **"EXTREMELY FLAMMABLE"** and instructs the user to read other cautions on the back panel. Barr Ex. H. The back panel includes the following cautionary language:

DANGER! EXTREMELY FLAMMABLE. KEEP AWAY FROM HEAT, SPARKS, FLAME AND ALL OTHER SOURCES OF IGNITION. VAPORS MAY CAUSE FLASH FIRE OR IGNITE EXPLOSIVELY. Do not smoke. Extinguish all flames and pilot lights, and turn off stoves, heaters, electric motors and all other sources of ignition during use and until all vapors are gone. Beware of static electricity that may be generated by synthetic clothing and other sources.

Whenever possible, use outdoors in an open area. Do not use in areas where vapors can accumulate and concentrate such as basements, bathrooms or small enclosed areas. USE ONLY WITH ADEQUATE VENTILATION TO PREVENT BUILD-UP OF VAPORS. Open all windows and doors. Use only with a cross-ventilation of moving fresh air across the work area. If strong odor is noticed or you experience light dizziness, headache, nausea or eye watering—STOP—ventilation is inadequate. Leave area immediately.

Barr Ex. H. The Parks Adhesive Remover label contains the following warning:

> Contact with flame or hot surface may produce toxic gases. **KEEP AWAY FROM HEAT, SPARKS, AND FLAME. DO NOT SMOKE.** Extinguish all flames and pilot lights, and turn off stoves, heaters, electric motors, and other sources of ignition during use and until all vapors are gone. **USE ONLY WITH ADEQUATE VENTILATION.** To avoid breathing vapors or spray mist, open windows and doors or use other means to ensure fresh air entry during application and drying.

Barr Ex. G.

In preparation for use of the lacquer thinner, Kirstein opened the sliding door on the south side of his house (opposite of the side where he was working) opened his front door, turned off the furnace pilot and the fireplace pilot, and turned down the water temperature of the hot water heater. Defs. 12(M) ¶¶ 26, 28; Pl. 12(N) ¶ 3. Kirstein turned on the motorized electric exhaust fan in the downstairs bathroom. Defs. 12(M) 27. Kirstein knew that his air conditioner was powered by electricity, and was aware of a switch on his furnace that deactivates the blower motor in the air conditioning unit. *Id.* ¶ 29. He did not deactivate the blower motor. *Id.* Kirstein testified that he used a rag on a scraper to apply lacquer thinner and to wipe the surface of the floor. Defs. 12(M) ¶ 30; Pl. 12(N) ¶ 4. Kirstein completed the kitchen and then proceeded to the bathroom, the hallway, and the foyer, working his way backwards towards the front door. Defs. 12(M) ¶ 30. To finish the hallway, Kirstein needed to close the front door. *Id.* ¶ 31. Moments after he closed the front door, the hallway was in flames. *Id.* Kirstein suffered burns over 20% of his body, with slightly over one-third of those burns on his feet. Pl.Ex. A. Kirstein had full thickness burns on the dorsal and plantar surfaces of both feet. Pl.Ex. A.

## DISCUSSION

### I. DR. NELSON'S TESTIMONY and FRE 702

Many assertions in the plaintiffs' 12(N) statement are supported only by the deposition testimony of Dr. Gary Nelson, a safety engineer whose expert testimony plaintiffs proffer. Dr. Nelson is prepared to testify as follows: The risks of using the defendants' products were enhanced by the direction to use lacquer thinner after using the adhesive remover. Pl. 12(N) ¶ 11. Another brand of adhesive remover advises the use of mineral spirits instead of lacquer thinner; mineral spirits are less hazardous than lacquer thinner. *Id.* ¶¶ 22—23. Methyl ethyl ketone ("MEK"), the active ingredient in lacquer thinner, is absorbed by permeable objects. *Id.* ¶ 18. When the products are used together, the "gooey substance thus created" will continue to burn after the MEK "flashes out." *Id.* ¶ 16. The product labels do not explain that vapor can travel and create an explosive condition outside the area of use. *Id.* ¶ 19. The lacquer thinner individually, and the lacquer thinner and adhesive remover combined, create a hazardous condition that is beyond the understanding of the homeowner. *Id.* ¶ 17. Dr. Nelson further explains:

> If we have vapor in this room and we walk in and there's a flash, we're going to get our eyebrows singed, our hair singed, and we're going to get some burns. If I take MEK (the active ingredient in lacquer thinner), and I mix it with something and I spread this stuff on your skin, and that flash ignites the MEK within the substance, and it's continually giving off vapor from it, it will continue to burn .... if it's mixed with a gooey substance, that gooey substance will continue to burn. We're no longer now talking about just a flash and the fire is gone. We're talking about a continually burning substance....

Pl.Ex. D at pp. 164

Defendants challenge the admissibility of Dr. Nelson's statements pursuant to Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. This rule "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. § 79, § 89 (1993). Seventh Circuit cases interpreting *Daubert* have suggested a two-step inquiry for evaluating expert testimony under Rule 702. First, the court must determine whether the expert's testimony is reliable. Second, the court must determine whether the testimony will assist the trier of fact. *Cummins v. Lyle Industries,* 93 F.3d 362, 367—68 (7th Cir. 1996).

"In the context of theoretical and applied science, [the first] requirement places on the court the obligation to ensure that the proffered testimony pertains to scientific knowledge." *Id.* (citing *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1995); *Porter v. Whitehall Labs.,* 9 F.3d 607, 614 (7th Cir.1993)). An expert scientific opinion must be grounded in the "methods and procedures of science," and must consist of more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795. Put another way, "a district court asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996). In *Cummins,* the plaintiff argued the application of well-known instruments of the engineering profession to a particular and "not-out-of-the-ordinary" application required substantial deviation from the paradigm announced by the Supreme Court in *Daubert.* The Seventh Circuit rejected that argument, stating:

The Supreme Court did acknowledge in *Daubert* that, because the case presented a matter of scientific inquiry, its discussion was limited to the "scientific context." (citation omitted). The court also noted, just as pointedly, that its holding was not limited to cases involving "novel" scientific theories. [*Daubert,* 509 U.S. at 592 n. 11, [113] S.Ct. at [2796] n. 11]. As the case law of this circuit amply demonstrates, we believe that this latter remark in *Daubert* counsels against a wholesale abandonment

of the *Daubert* analysis simply because the issue before the court, although rooted in science, involves the application of science to a concrete and practical problem. *See, e.g., Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292—94 (7th Cir.1996) (safety management expert); *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341 (7th Cir.1995) (testimony concerning cord wrap on hospital equipment). Indeed, the drafters of Rule 702 seem to have acknowledged that the line between "scientific" and "technical" is not a bright one.

*Cummins,* 93 F.3d at 367 n. 2.

Dr. Nelson admits he is not a chemist; he is a safety engineer with an educational background in industrial and product safety. His graduate coursework included a course on fire protection and prevention. Pl.Ex. D. In the last 10 to 25 years, Dr. Nelson has not done any lab work in the fire protection area. *Id.* at pp. 19, 32. Dr. Nelson contends he did not have the products in this case or their mixture chemically tested because

[i]t wasn't necessary ... the analysis that I performed was a review of the chemical properties based on the material safety data sheets from the point of view of what an industrial hygienist or safety engineer would normally do in relation to those sheets. In other words, I relied on the information provided by Parks and [Barr] rather than doing any of it myself.

*Id.* at p. 21.

Defendants urge that, based on the record before this court, Dr. Nelson cannot be allowed to present to the factfinder his hypothesis that Parks adhesive remover absorbs MEK from the lacquer thinner and gradually releases MEK vapor, thereby resulting in a continuous and longer burn upon ignition of the MEK vapor on its surface. The material data safety sheet ["MSDS"] for the adhesive remover lists it as nonflammable, and nothing in the record supports a finding that it is flammable. Dr. Nelson does not testify that the *flammability* of either product was increased by its combination with the other product. Rather, Dr. Nelson's testimony is that the *danger* of using either product is increased by using the

products together, because the absorption of MEK into the adhesive remover can result in a continuous burn. Pl.Ex. D. at p. 164. The issue, then, is whether Dr. Nelson can testify that both products become more dangerous through the absorption of one into the other.

Even assuming Dr. Nelson's experience as a safety engineer qualifies him to testify about the gradual release of vapor from a substance that has absorbed a liquid, there is no evidence in the record that the Parks adhesive remover actually absorbs MEK from the Klean–Strip lacquer thinner. Dr. Nelson did not perform tests on the products or the combination of the products, and he did not arrange for any such tests to be performed. He offers no clinical testing, data, or studies that suggest the adhesive remover absorbs MEK. Nor does Dr. Nelson offer data or studies suggesting adhesive removers generally, or substances similar in chemical composition to adhesive removers, absorb MEK or chemicals similar in composition to MEK. Indeed, the only information in the record relating to MEK and absorption is: (1) the MSDS for Klean–Strip lacquer thinner which states the lacquer thinner "[m]ay be absorbed through the skin" (Barr Ex. F); and (2) Dr. Nelson's description of his testimony in another case where rags and clothing absorbed MEK (Pl.Ex. D. p. 62). However, skin and fabrics may absorb chemicals that adhesive remover does not absorb.

The question whether adhesive remover absorbs the MEK in lacquer thinner and gradually releases MEK vapor is a question of science. An expert scientific opinion must be grounded in the "methods and procedures of science," and must consist of more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795. In presenting their hypothesis about the danger of the adhesive remover/lacquer thinner combination, plaintiffs rely upon 16 C.F.R. Part 1500.5, which provides in part:

It may not be possible to reach a fully satisfactory decision concerning the ... flammable ... properties of a [mixture of substances] from what is known about its components or ingredients. The mixture itself should be tested.

Yet, Dr. Nelson performed no tests and presents no scientific evidence of a synergistic or combinational effect that creates a more continuous or longer burn. He offers only an untested hypothesis. On this record, the court cannot conclude that Dr. Nelson's absorption testimony has a grounding in the methods and procedures of science. Accordingly, that testimony is inadmissible under Fed.R.Evid. 702.

█ Nor is the court confident about Dr. Nelson's qualifications to testify as an expert on the requirements of the federal labeling laws. When asked for the basis of his opinions, Dr. Nelson could not identify publications in his field or any other sources that recommend the warnings and precautionary language he suggests. He points to no industry customs as evidence of the allegedly required additional warnings. Nor does he provide tests or studies of any kind that demonstrate the value of his proposed additional language, or suggest which warnings and precautions should be removed to make room for all the additional explanations he desires. Although Dr. Nelson claims to consult companies about their warning labels from time to time, he could not identify a single company or individual for whom he has done such work. Dr. Nelson fails to explain the methodology by which people in his field reach their conclusions about required warnings and precautionary instructions under federal law. Indeed, Dr. Nelson admits the basis for his conclusions is the "logical" application of the federal statute— "a matter of two and two equals four." Pl. Ex. D. at p. 95. This does not inspire great confidence in his ability to assist the factfinder. Dr. Nelson may not give an opinion that amounts to an unsubstantiated assertion of the warnings that are required by the law. *See, e.g., Strickland v. Royal Lubricant Co., Inc.,* 911 F.Supp. 1460, 1469 (M.D.Ala.1995).

Nonetheless, Dr. Nelson is a safety engineer by training, and for 12 years he worked at Texas A & M identifying, evaluating, and controlling potential hazards. He testifies safety engineers evaluate hazards "in terms of risk, in terms of the likely severity and probability of mishap, and then you control hazards basically by three methods ... the

third is through instructions and warnings and procedures and policies." Pl.Ex. D. at p. 23—24. However, Dr. Nelson offers no evidence that he followed that methodology in this case. He presents no evidence of the likely severity and probability of mishap associated with the additional dangers, or that he analyzed these factors; by his own admission, that is how safety engineers evaluate hazards. Rather, Dr. Nelson offers only his conclusions. "[A] district court asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.*, 78 F:3d 316, 318 (7th Cir. 1996). The Seventh Circuit has repeatedly approved the application of the *Daubert* standard in cases involving safety experts and matters of applied science. *See Cummins*, 93 F.3d at 367 n. 2. Accordingly, Dr. Nelson's testimony about additional principal hazards is inadmissible.

## II. SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1209 (7th Cir.1993). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services–Milwaukee, Inc.*, 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis*, 5

F.3d 1031, 1033 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## III. PRODUCTS LIABILITY CLAIMS

To prevail on a claim of strict liability under Illinois law, plaintiffs must show: (1) the injury resulted from a condition of the product; (2) the condition was unreasonably dangerous; and (3) the condition existed at the time it left the manufacturer's control. *Faucett v. Ingersoll–Rand Min. & Machinery Co.*, 960 F.2d 653, 655 (7th Cir.1992). A product may be unreasonably dangerous in two ways: (1) a design or manufacturing defect; or (2) a failure to warn of a danger posed by the product of which the average consumer would not be aware. *Lamkin v. Towner*, 138 Ill.2d 510, 150 Ill.Dec. 562, 563 N.E.2d 449 (1990).

### A. Failure to Warn and Preemption under the FHSA

The Federal Hazardous Substance Act ("FHSA") was enacted in 1962 to "provide national uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce...." House Comm. on Interstate and Foreign Commerce, Federal Hazardous Substances Labeling Act, H.R.Rep. No. 1861, 86th Cong.2d Sess. 2 (1960), reprinted in 1960, U.S.C.C.A.N. 2833. When the FHSA was amended in 1966, the legislative history discussed "the impracticality of having the states produce potentially 50 different labels for a particular hazardous substance." *Moss v. Parks Corp.*, 985 F.2d 736 (4th Cir.1993), cert. denied, 509 U.S. 906, 113 S.Ct. 2999, 125 L.Ed.2d 693. The 1966 amendment added the following preemption provision:

[I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under [the FHSA] designed to protect against a risk of illness or injury associated with the substance, no State ... may establish or continue in effect a cau-

tionary labeling requirement applicable to such substance or packaging and designed to protect against the same risks of illness or injury *unless such cautionary labeling requirement is identical to the labeling requirement under [the FHSA].*

15 U.S.C. § 1261, Note (b)(1)(A) (emphasis added).

■ Based on this preemption provision, the great majority of courts around the country have held that as to products governed by the FHSA, a common law tort action based on an alleged failure to warn may be brought only for non-compliance with the FHSA labeling requirements. *See, e.g., Moss* 985 F.2d 736; *DeHaan v. Whink Prods. Co.,* 1994 WL 24322 (N.D.Ill. Jan.26, 1994); *Busch v. Graphic Color Corp.,* 169 Ill.2d 325, 214 Ill.Dec. 831, 662 N.E.2d 397 (Ill.1996). In *Moss,* the plaintiff suffered burns when fumes from a paint thinner erupted into flames; the plaintiff alleged the paint thinner manufacturer provided inadequate warnings of the product's propensity to ignite. In affirming the district court's granting of summary judgment, the *Moss* court held that "if the plaintiff requests a label that is more elaborate or different than the one required by the FHSA and its regulations, the claim is preempted." 985 F.2d at 740. Plaintiffs do not seem to seriously dispute that their state law "failure to warn" claim is preempted to the extent it would impose labeling requirements different from or in addition to those imposed by federal law. Rather, plaintiffs correctly point out they may still recover under state tort law by proving defendants failed to comply with the FHSA.

## B. Misbranding Under the FHSA

It is undisputed that Parks adhesive remover and Klean–Strip lacquer thinner are hazardous substances within the meaning of the FHSA. A hazardous substance is misbranded under the FHSA if it fails to bear a label which states conspicuously:

(e) an affirmative statement of the principal hazard or hazards, such as "Flammable," "Combustible," "Vapor Harmful," "Causes Burns," "Absorbed Through

Skin," or similar wording descriptive of the hazard;

(f) precautionary measures describing the action to be followed or avoided, except when modified by regulation of the Secretary....

15 U.S.C. § 1261(p)(1).

■ *Parks Adhesive Remover.* Plaintiffs argue the labeling of Parks adhesive remover is deficient in several respects. First, plaintiffs argue Parks failed to warn of a "new element of danger" created by using adhesive remover and lacquer thinner in succession. This new danger is the continuous or longer burning caused by the alleged absorption of MEK from the extremely flammable lacquer thinner into the nonflammable adhesive remover, creating a "gooey substance" that gradually releases MEK vapor after the MEK vapor in the air would otherwise have "flashed out." Resp. p. 6. This argument fails to create a genuine issue for trial, because there is no evidence in the record that Parks adhesive remover actually absorbs MEK from lacquer thinner. The only suggestion that this occurs comes from Dr. Nelson; for the reasons previously discussed, Dr. Nelson's testimony about an absorption effect between the two products is inadmissible. Inadmissible testimony cannot be used to withstand summary judgment. *Navarro v. Fuji Heavy Industries, Ltd.,* 117 F.3d 1027 (7th Cir.1997); *Whitted v. General Motors Corp.,* 58 F.3d 1200, 1204 (7th Cir. 1995).

Because Dr. Nelson's hypothesis that the adhesive remover absorbs MEK is inadmissible, (1) plaintiffs' analogy to extremely flammable contact adhesives found unsafe by the Consumer Product Safety Commission is inapposite and (2) there is no evidence that any danger stemming from Parks' recommendation of lacquer thinner has anything to do with the successive use of the products, as opposed to the extreme flammability of lacquer thinner. Plaintiffs suggest "[Dr. Nelson's] hypothesis is proven by the photographs of Mr. Kirstein's feet." Given that extremely flammable lacquer thinner was used to wipe the floor at the time of the fire, the fact that Mr. Kirstein's feet were severely burned is—at most—a scintilla of evidence

**762**

in support of Dr. Nelson's hypothesis. The mere existence of a scintilla of evidence is insufficient to create a genuine issue for trial. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

■ Second, Dr. Nelson "criticizes" the Parks warnings as "not set off within the text." Dr. Nelson does not elaborate on this criticism, or explain how the placement of the warnings violates the FHSA. His conclusory assertion fails to create a genuine issue for trial. Third, Dr. Nelson asserts the instruction on the front display panel to "See other health hazard information on back panel" appears in too small type size. The relevant regulations require this instruction to appear in "the same type size as that required in Table 1 for other cautionary material which appears elsewhere on the label ... [which is] determined by the area of the panel on which it does appear." 16 C.F.R., Part 1500.121(c)(2)(iii). "When an item of labeling is required to be in a specified type size, all upper case, or capital, letters must be at least equal in height to the required type size, and all other letters must be in the same style as the upper case or capital letters." *Id.,* Part 1500.121(c)(2)(ii). The court has examined Table 1, has measured the type size as defined by the regulations, and has found Dr. Nelson's assertion to be factually incorrect.

■ Finally, Dr. Nelson claims the Parks adhesive remover label violates Part 1500.122 by advertising its product as "non-flammable" on its front display panel, thereby detracting from the following warnings on the back display panel:

Contact with flame or hot surface may produce toxic gases. **KEEP AWAY FROM HEAT, SPARKS, AND FLAME. DO NOT SMOKE.** Extinguish all flames and pilot lights, and turn off stoves, heaters, electric motors, and other sources of ignition during use and until all vapors are gone.

Barr Ex. G. As previously discussed, it is undisputed the adhesive remover is nonflammable, and there is no admissible evidence in the record that, as a matter of chemistry, its flammability changes when used with lacquer thinner. It is plain that the warning to keep the adhesive remover

away from "heat, sparks, and flame" relates back to the danger that "[c]ontact with flame or hot surface may produce toxic gases." Essentially, Dr. Nelson criticizes Parks for including more cautionary language about sparks and flames than he deems necessary for a nonflammable product that may produce toxic gases when heated. Even assuming Parks showed an abundance of caution in this regard, no reasonable jury could find Parks' accurate description of its product as "nonflammable" is misleading. As a matter of law, Parks' display panels meet the requirements of the federal labeling laws. To the extent Dr. Nelson argues the Parks label should have included additional or different warnings not required by the FHSA or its regulations, those claims are preempted. *Moss,* 985 F.2d at 740. Accordingly, Parks' motion for summary judgment is granted as to Count II (failure to warn)

■ *Klean–Strip Lacquer Thinner.* Dr. Nelson next opines that the warnings and precautionary measures listed on the Klean–Strip lacquer thinner do not meet the requirements of the 15 U.S.C. § 1261(p)(1)(e) and (f). The *entirely* of plaintiffs' briefing on this point is quoted here:

Nelson criticizes the Barr lacquer thinner as not conforming to Section 1261. One principal hazard that is not listed is that MEK is absorbed by clothing, rags and skin. (Plaintiff Answer, Exhibit D, Nelson deposition, page 68) Additionally, the full nature of the hazard is not, in any way, communicated by the phrase, "flammable or extremely flammable." *Id.* at 70.

Finally, it does not indicate that the vapor can travel and create explosive conditions. (pages 73 –75) Additionally, section 1261(f) [sic] requires precautionary measures and the precautionary measures stated are inadequate. *Id.* at page 77.

Resp. at p. 7. As previously discussed, Dr. Nelson's conclusions about additional "principal hazards" are inadmissible under Fed. R.Evid. 702. Without any evidence in the record concerning the severity and probability of mishaps associated with Dr. Nelson's proposed additional hazards, no reasonable jury could conclude those hazards are "prin-

cipal hazards" for which the FHSA requires explicit warnings.

■ Dr. Nelson also urges that the precautionary language on the back of the lacquer thinner can is inadequate. Pursuant to Local Rule 12(N), parties opposing summary judgment must set forth in their 12(N) statements additional facts requiring denial of summary judgment. Plaintiffs fail to set out facts in their 12(N) statement supporting their conclusion that the lacquer thinner's precautionary language is inadequate. Nor do they even bother to set out these facts in their brief. "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994). The court has scoured the deposition testimony of Dr. Nelson, and it concludes his proposed precautionary language is preempted by the FHSA.

The back panel of the lacquer thinner can includes the following cautionary language:

**DANGER! EXTREMELY FLAMMABLE. KEEP AWAY FROM HEAT, SPARKS, FLAME AND ALL OTHER SOURCES OF IGNITION. VAPORS MAY CAUSE FLASH FIRE OR IGNITE EXPLOSIVELY**. Do not smoke. Extinguish all flames and pilot lights, and turn off stoves, heaters, electric motors and all other sources of ignition during use and until all vapors are gone. Beware of static electricity that may be generated by synthetic clothing and other sources.
Whenever possible, use outdoors in an open area. Do not use in areas where vapors can accumulate and concentrate such as basements, bathrooms or small enclosed areas. USE ONLY WITH ADEQUATE VENTILATION TO PREVENT BUILD–UP OF VAPORS. Open all windows and doors. Use only with a cross-ventilation of moving fresh air across the work area. If strong odor is noticed or you experience light dizziness, headache, nausea or eye watering—STOP—ventilation is inadequate. Leave area immediately.

Barr Ex. H. Among Dr. Nelson's objections to the precautionary language are these: (1) it instructs the user to turn off all sources of ignition instead of instructing the user to turn off the main circuit breaker and the main gas supply, which would be a clearer instruction; (2) it fails to explicitly connect the precaution of turning off all sources of ignition to the risk of fire, and this explanation is required to make the instruction effective; (3) it fails to explain what "vapor" is, and that it is invisible and can travel; (4) it fails to explain what it means by "adequate ventilation"; and (5) it fails to suggest wearing impermeable protective gear and a breathing apparatus. Dr. Nelson presents many ideas for more elegant and elaborate instructions; he fails to explain why the actual precautionary instructions are inadequate under the FHSA. The instructions label cautions the user to turn off *all* possible sources of ignition. It explicitly mentions the danger of vapors building up and states in bold capitals: **VAPORS MAY CAUSE FLASH FIRE OR IGNITE EXPLOSIVELY.** It gives consumers a simple and understandable test for judging the adequacy of ventilation: "[i]f strong odor is noticed or you experience light dizziness, headache, nausea or eye watering—STOP—ventilation is inadequate." The fact that more detailed and thorough instructions can be written is unquestionable. Of course, it is possible to write instructions that include definitions of terms like "vapor" and explanations of why and how each precautionary instruction reduces risks. Plaintiffs fail to explain why the actual precautionary instructions are not sufficient to meet the requirements of the FHSA as a matter of law.

Indeed, the Consumer Product Safety Commission ("CPSC"), the agency which oversees enforcement of the FHSA, provides sample warning labels for some products. While sample precautionary instructions are not specifically provided for lacquer thinner, the CPSC has provided sample precautionary instructions for "contact adhesives," the vapors of which are extremely flammable. The CPSC offers the following as sufficient precautionary instructions:

Prevent buildup of vapors—open all windows and doors—use only with cross-ventilation.

Keep away from heat, sparks, and open flame.

Do not smoke, extinguish all flames and pilot lights, and turn off stoves, heaters, electric motors, and other sources of ignition during use and until all vapors are gone.

Close container after each use.

Keep out of the reach of children.

16 C.F.R. § 1500.133(b) (1997). If these precautionary instructions are sufficient, then the precautionary instructions for Klean-Strip lacquer thinner are sufficient as a matter of law. Accordingly, Barr's motion for summary judgment is granted as to Count II (failure to warn)

### C. Design and Manufacturing Defects

■ The second manner in which a product may be unreasonably dangerous is through a design or manufacturing defect. *Lamkin v. Towner,* 138 Ill.2d 510, 150 Ill. Dec. 562, 563 N.E.2d 449 (1990). Plaintiffs' only argument that Parks adhesive remover was unreasonably dangerous relates back to Dr. Nelson's MEK absorption hypothesis. As Dr. Nelson failed to provide any support for that hypothesis, a reasonable jury could not find the adhesive remover unreasonably dangerous.

■ When asked if the lacquer thinner was defective in some way aside from the warnings, Dr. Nelson conceded it was not. Pl.Ex. D. at p. 137—138. However, plaintiffs argue the lacquer thinner is unreasonably dangerous under the "consumer contemplation" test because Dr. Nelson opines that to properly use lacquer thinner in an enclosed space, one would have to use respiratory equipment that is not reasonably available to the consumer. Under the consumer contemplation test, "a product is only considered defective or unreasonably dangerous if it fails to perform in a manner the ordinary consumer would expect." *Todd v. Societe Bic S.A.,* 21 F.3d 1402 (7th Cir.1994). Obviously, the ordinary consumer's expectations relate in some way to the product's warnings. The manufacturer of Klean-Strip lacquer thinner

warns, "Do not use in areas where vapors can accumulate and concentrate such as basements, bathrooms or small enclosed areas." Barr Ex. H. Thus, the ordinary consumer would expect that it is dangerous to use lacquer thinner in small enclosed areas.

■ Second, plaintiffs argue the lacquer thinner is unreasonably dangerous under the "risk-utility" test, because mineral spirits are less dangerous. A product is unreasonably dangerous under the risk-utility test when the product could have been designed to prevent foreseeable harm without hindering its function or increasing its price. *Lamkin,* 138 Ill.2d 510, 150 Ill.Dec. 562, 563 N.E.2d 449. Plaintiffs' argument fails for two reasons. First, the Seventh Circuit has questioned whether Illinois courts apply the risk-utility test to simple but obviously dangerous products. *See Todd,* 21 F.3d at 1412. Second, even if the test applies, it is not satisfied by showing a completely different product is safer. Even if mineral spirits are less dangerous, that does not mean lacquer thinner can be manufactured to be less dangerous. Accordingly, plaintiffs' argument is without merit. As no genuine issue of material fact exists for trial, both defendants are entitled to summary judgment on Count I.

## IV. DERIVATIVE CLAIMS

Because Joy Kirstein's claims derive from her husband's product liability claims, defendants are entitled to summary judgment on Counts III and IV.

## *CONCLUSION*

Defendants' motions for summary judgment are granted. Judgment is entered in favor of defendants W.M. Barr & Company, Inc. and Parks Corporation and against plaintiffs George Kirstein and Joy Kirstein.